THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION
CIVIL CASE NO. 2:10cv001

| | |
|---|---|
| **BENJAMIN M. STEWART,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| vs. ) | **DECISION AND ORDER** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 14] and the Defendant's Motion for Summary Judgment. [Doc. 18].

**I.    PROCEDURAL HISTORY**

The Plaintiff Benjamin Stewart filed an application for a period of disability and disability insurance benefits and Supplemental Security Income on January 26, 2006, alleging that he had become disabled as of April 1, 1999, due to attention deficit hyperactivity disorder, mild retardation, organic mental disorders, and anxiety related disorders. [Transcript ("T.") 116-19, 141, 192]. The Plaintiff's application was denied initially and on reconsideration. [T. 120-24, 128-35]. A hearing was held before

Administrative Law Judge ("ALJ") Karen Baker on October 23, 2008. [T. 44-115]. On January 27, 2009, the ALJ issued a decision denying the Plaintiff benefits. [T. 12-23]. The Appeals Council accepted additional evidence, but denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 1-4]. The Plaintiff has exhausted his available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner <u>de novo</u>. <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than

creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III.  THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's

3

physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's RFC, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id.

## IV. FACTUAL BACKGROUND

At the time of his hearing, Plaintiff was 29 years old. He was 5'6" tall and weighed 270 pounds. [T. 77, 191].

Plaintiff has engaged in periods of substantial gainful activity since his alleged onset date. Plaintiff worked as a cook in a series of fast food restaurants and other establishments for periods in 1999, and for sustained periods in 2001 until mid-2003, again in 2004, and from August 2007 to

4

December 2007.  He was not fired from any position except McDonald's [T. 73], and he was rehired at places where he had worked before on several occasions.  [T. 72-73].  From August 2007 to April 2008, Plaintiff worked at WalMart, stocking toys.  He testified that he quit this job because he could not keep up with his required tasks.  [T. 60-61].  At the time of the ALJ hearing, Plaintiff was working at Zaxby's twenty hours per week, cooking chicken and washing dishes.  He stated that he did not do the kind of cooking that required keeping up with orders at a required pace.  [T. 60].

Plaintiff was placed in special education classes starting in elementary school.  In the first grade, he began receiving special services in the form of speech and language assistance.  [T. 279].  He was noted as being below average in reading and math, with "frequent attention deficit" marking his behavior.  [T. 275].  The school screened him for a learning disability and attention deficit problems, but only a learning disability was found.  [T. 268-73, 259].  In 1987, he was placed in special education classes in order to receive additional learning disability, speech and language services.  [T. 251-52].  In high school, he was removed from the diploma track and placed on the certificate track.  [T. 249].  Plaintiff left school at the age 15 or 16, having completed the tenth grade.  [T. 55, 57].

5

Case 2:10-cv-00001-MR   Document 21   Filed 11/29/11   Page 5 of 20

Plaintiff's school records include an undated WISC-R IQ test, indicating a verbal scale IQ of 85, a performance IQ of 91, and a full scale IQ of 87. [T. 238]. An IQ test administered in 1993 indicated a verbal IQ score of 75, a performance IQ of 72, and a full scale IQ of 71. [T. 302]. A 1996 IQ test revealed a verbal IQ of 72, a performance IQ of 75, and a full scale IQ of 72. [T. 297].

Adaptive behavior testing performed in 1996 resulted in ratings of average in five areas, below average in four areas, poor in four areas, and very poor in two areas. [T. 299]. While Plaintiff was found to be performing "within expectancy" in broad reading and written language skills, he was found to be "functioning in the borderline range of intelligence overall" and "at a level considerably lower than same-age peers." [T. 300].

Records of Plaintiff's job coaches at Webster Enterprises of Jackson County from October 22, 1996 to May 14, 1999 begin with a vocational evaluation. [T. 379-435]. Plaintiff was noted as having adequate concentration skills, and not to be interested or motivated to increase his output. He got along well with coworkers and supervisors. No better than fair attendance, decreasing productivity, social isolation, and failure to produce at potential were noted in periodic reports. In spite of problems with reading a

6

few words, it was noted that he filled out his own job applications and demonstrated good judgment. [T. 425]. It was further noted that Plaintiff and his mother failed to cooperate reasonably with some employment opportunities. [T. 408, 402, 396-97]. In March 1999, it was noted that he was doing somewhat better with speed in stocking. [T. 392]. In April 1999, it was noted that his job at Walmart was in jeopardy due to a lack of motivation, independence and focus. [T. 390]. Plaintiff's job coach opined that Plaintiff knew how to do the work, but chose not do it. [T.383-87]. By May 1999, however, it was noted that he had stopped incurring on-the-job writeups and was performing "ok." [T. 379].

Plaintiff's primary physician was Dr. David Ramsey of Sylva Medical Center. Between 2003 and 2006, he saw Dr. Ramsey three times for minor problems, once receiving an order for counseling and once receiving a prescription for Lexapro to address anxiety. [T. 305-07]. On February 2, 2007, Plaintiff reported mild depression to Dr. Wolf of WNC Internal Medicine, for which he was also prescribed Lexapro. [T. 376].

Records of Smoky Mountain Behavioral Services from 2005 and 2006 indicate that Plaintiff was initially diagnosed with mild mental retardation. [T. 308-15, T. 341-52]. On March 2, 2006, he was evaluated for Adult Attention

7

Deficit Disorder (ADD) by Mark Lawrence, M.D. At that time, Dr. Lawrence noted Plaintiff did quite well on cognitive testing, and he expressed doubt that Plaintiff was mildly mentally retarded, noting that Plaintiff's presentation during the evaluation was not consistent with such a diagnosis. He further noted that it was "very difficult to make a diagnosis of ADD retroactively," and that the evaluation for this condition resulted primarily from his mother's insistence. [T. 341].

On June 7, 2006, Jerelene V. Howell, M.S. and Jennifer Zeisz, Ph.D. performed a consultative disability evaluation for Disability Determination Services (DDS). [T. 316-21]. They noted that Plaintiff was able to sustain attention to simple repetitive tasks and follow directions. Plaintiff reported to them that he had been diagnosed with ADD and that he had been medicated for that condition with Ritalin for "many years." [T. 317]. He claimed that although he was prescribed Lexapro, he never took it. [T. 318]. His mother reported that he could read and write, but could not look up a number in the phone directory; that he was independent in hygiene, but not in money management; and that he could not follow a recipe or operate a washing machine himself. [T. 319]. Results of WAIS-III IQ testing indicated a verbal IQ of 68, a performance IQ of 69, and a full scale IQ of 66, which was noted

8

to be in the extremely low or mild mental retardation range of intellectual ability. [T. 319-20]. It was further noted that Plaintiff showed a low tolerance for frustration, impulsivity, and a depressed mood. [T. 320]. Given Plaintiff's intellectual abilities, Ms. Howell and Dr. Zeisz concluded that "it would be difficult for [Plaintiff] to cope with the demands and stressors inherent in most work situations" and that "it would be difficult for him to function adequately in a fast-paced employment environment that requires problem solving and decision making." [T. 320-21].

W.W. Albertson, Ed.D. performed a Psychiatric Review Technique (PRT) for DDS on June 19, 2006. [T. 327-340]. He noted that Plaintiff had ADD and mental retardation, and that these, along with anxiety and depression, might be Plaintiff's primary problems rather than borderline intellectual functioning. Nevertheless, he concluded that Plaintiff's limitations on activities of daily living (ADLs) did not preclude him from performing simple routine repetitive tasks. [T. 339]. Dr. Albertson followed this with a Mental Residual Functional Capacity (RFC) assessment in which he opined that Plaintiff could perform simple routine repetitive tasks in a low stress, low social, nonproduction environment. [T. 323-27].

9

Ed Ross, Ph.D. performed another PRT on October 23, 2006 for DDS. [T. 354-367]. He followed this with a mental RFC indicating that Plaintiff had no marked limitations, few moderate limitations, and that his functional level, including the performance of substantial gainful activity at a variety of jobs, was inconsistent with global mental retardation. [T. 370].

At the ALJ hearing, Plaintiff reported that he has always lived with his mother other than for a brief period in 2005, when he moved to Los Angeles to live with a 14-year-old girl he met online. While in Los Angeles, Plaintiff worked briefly as a cashier at several jobs for a few weeks' duration at a time. The girl's parents allowed Plaintiff to live with them in their home, until the girl reported a possible pregnancy to her doctor. This triggered criminal charges of statutory rape against the Plaintiff that were resolved in part by his moving back to North Carolina to live with his own mother. [T. 48-55].

Plaintiff testified that he required his mother's assistance in filling out job applications. [T. 62]. Plaintiff further testified that he has no driver's license, and that his mother drove him to all jobs. He indicated that he did not have a driver's license because he had a phobia about driving and was claustrophobic in the car. When he lived in Los Angeles, he would take public transportation to work. [T. 75].

Plaintiff testified that he was disabled by his inability to "follow through" with tasks. [T. 74]. He testified that in recent years, his disorientation and trouble with thinking and "keeping up" with things had worsened. He testified that he has not been to a doctor recently, other than for counseling for depression in 2006. [T. 71]. Plaintiff testified that he no longer receives mental health counseling, explaining: "I just don't feel like I need it." He reported taking Lexapro for depression, and that this medication helped somewhat with his symptoms. [T. 80].

Plaintiff testified that he also has ADD. He reported that he took Stratera or Ritalin for this condition as a child, but that those medications did not help. He stated that he felt that Lexapro did help with his ADD. [T. 82-3].

Plaintiff's mother, Donna Hunt, testified that his mental disability began when he was documented as having ADD as a child. She stated that this condition worsened when he was in high school. She recalled that he was switched from a diploma track to a non-diploma track, only getting two credits in his second attempt at completing his freshman year. She reported that after retrying several grades without attaining credit, Plaintiff left high school at the age of eighteen. [T. 90-91]. Ms. Hunt testified that as a child, Plaintiff could not learn to tie his shoes, that he did not learn to bathe himself until high

11

school, and that he still had to have constant reminders about hygiene. [T. 90]. Ms. Hunt further testified that she has to take Plaintiff to apply for jobs and that she fills out applications for him. She reported that he tried once to get a driver's license but that his fear of driving caused him to fail. [T. 93, 95]. She stated that she was trying to find a counselor who could confirm that he has adult ADD, but that she had not yet found one. [T. 97].

Dr. Roy Sumpter was sworn to testify as a vocational expert (VE) at the ALJ hearing. [T. 104-07]. He classified Plaintiff's prior work (fast food, cashier II, stocker, dishwasher and kitchen helper) as variously being light and medium, all with SVPs of 2.[1] [T. 104]. When the ALJ asked whether a person limited to nonproduction, simple tasks, and low production demands could perform any of Plaintiff's past work, the VE responded that such a person could perform the jobs of stocker, fast food back worker, kitchen helper and dishwasher. [T. 105-06].

## V. THE ALJ'S DECISION

On January 27, 2009, the ALJ issued a decision denying the Plaintiff benefits. [T. 12-23]. Proceeding to the sequential evaluation, the ALJ found

---

[1] SVP stands for specific vocational preparation rating. A rating of 2 indicates training that exceeds a short demonstration but may require a period of up to one month. Dictionary of Occupational Titles (DOT) Appx. C.

12

that the Plaintiff's date last insured was December 31, 2012 and that he had periodically engaged in substantial gainful activity since April 1, 1999, the alleged onset date. [T. 14]. The ALJ then determined that Plaintiff's borderline intellectual functioning was a severe impairment. [Id.]. The ALJ concluded that the Plaintiff's impairment did not meet or otherwise equal a listing. [T. 16]. She then determined that Plaintiff retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but limited to simple, routine repetitive tasks in a low stress, nonproduction environment with limited social interaction. [T. 19]. She found that Plaintiff was able to perform his past relevant work as a fast food cook/kitchen worker, which work did not require duties precluded by Plaintiff's RFC. [T. 22]. Accordingly, she concluded that the Plaintiff was not disabled from April 1, 1999 through the date of her decision. [T. 23].

## VI. DISCUSSION

On appeal, Plaintiff argues that the ALJ erred in concluding that he was not presumptively disabled under Listing 12.05(C); that the ALJ erred in assessing his mental RFC; and that the ALJ erred in concluding that Plaintiff could perform his past relevant work. The Court will address each of these contentions in turn.

13

**A. The ALJ followed applicable law in evaluating Plaintiff's mental impairments under Listing 12.05(C), and his findings are supported by substantial evidence.**

In order to be found disabled under §12.05 of the Listings, a claimant must meet two requirements. First, as set forth in the introductory paragraph of §12.05, the claimant must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," that is, prior to the age of 22. 20 C.F.R. pt. 404, subpt. P, app. 1, §12.05. Second, the claimant must meet one of the four requirements described in subparagraphs A through D of §12.05. Id. As is relevant to the present proceeding, §12.05(C) requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1, §12.05(C).

In the present case, the ALJ concluded that while Plaintiff had attained a full scale IQ score of 66, he did not have an additional physical or mental impairment which imposed an additional and significant work-related limitation of function. [T. 17]. There is substantial evidence to support the ALJ's conclusion in this regard. While Plaintiff contends that his obesity imposes significant limitations on his ability to function, Plaintiff has never indicated any

14

specific physical impairments that are exacerbated by his size. Obesity in and of itself does "not correlate with any specific degree of functional loss." SSR 02-1p at *2. Further, the record does not show that Plaintiff's obesity resulted in any significant limitations in his ability to perform basic work-related activities.

While Plaintiff contends that he also experiences significant limitations in function from ADD, this impairment is not supported by the evidence of record. Although Plaintiff's school records indicate that he was evaluated for ADD in the first grade, the record is devoid of any references to an actual diagnosis or treatment for ADD. As the ALJ properly noted, Plaintiff was subjected to psychological evaluations in both the sixth grade and ninth grade in order to determine whether continued placement in special education classes was appropriate, and no references to a diagnosis of ADD were made in these evaluations. In fact, in the 1996 evaluation it was noted that Plaintiff exhibited good motivation, normal activity level and appropriate persistence, and that his attention and concentration were good throughout the evaluation. [T. 296]. Similarly, vocational rehabilitation records from 1996 to 1999 make no references to a diagnosis of ADD. There is also no indication in Plaintiff's school records that he was prescribed any medication for ADD during his

15

school years.  Further, while Plaintiff and his mother both claimed during his psychiatric evaluation with Dr. Lawrence in 2006 that he had ADD [T. 341], Dr. Lawrence was reluctant to make such a diagnosis, noting that "it is very difficult to make a diagnosis of ADD retroactively." [Id.].  For these reasons, the Court concludes that the ALJ's determination that Plaintiff did not meet Listing §12.05(C) is supported by substantial evidence.[2]

## B. The ALJ properly evaluated Plaintiff's residual functional capacity and his findings are supported by substantial evidence.

In order to determine whether Plaintiff's impairments prevented him from performance of his past work and whether he could perform other jobs that existed in significant numbers in the national economy despite those impairments, the ALJ was required to determine Plaintiff's RFC. The RFC is the most that a person can still do despite the physical and mental limitations that result from his impairment. 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1).

In the present case, the ALJ found that Plaintiff was capable of performing work at any exertional level but that the work needed to consist of

---

[2] Because the Court concludes that there is substantial evidence to support the ALJ's determination that Plaintiff did not satisfy the criteria of §12.05(C), the Court need not address Plaintiff's alternate argument that the ALJ also erred in finding that Plaintiff also failed to meet the other element of this listing, namely with regard to his adaptive functioning.

16

simple, routine repetitive tasks that were performed in a low stress, non-production environment with limited social interaction. [T. 18-22]. Plaintiff argues that this RFC fails to take into account the opinions of Dr. Zeisz, who opined that Plaintiff did "not have the cognitive aptitude to meet the demands or stressors inherent in most work situations." [T. 316].

There is substantial evidence to support the ALJ's determination of Plaintiff's RFC. As the ALJ properly noted, Dr. Zeisz's conclusions are not supported by the longitudinal evidence of record. Dr. Zeisz's evaluation included IQ test results which were notably lower than Plaintiff's relatively consistent IQ test results during school years.[3] Further, Dr. Zeisz's conclusions were based largely on the subjective reports of the Plaintiff and his mother, and as the ALJ separately noted, Plaintiff's mother demonstrated a strong motivation to obtain disability for her son as a means of financial support. [T. 21]. These are permissible bases upon which the ALJ could make her findings. Thus it was entirely appropriate for the ALJ to attribute no weight to Dr. Zeisz's opinions.

---

[3]The IQ scores in the 60's that were found by Dr. Zeisz happen to evidence an entirely different level of mental impairment (one more beneficial to Plaintiff's claim herein) under the Listings than did his consistent school-period scores, which were all in the 70's and above, without any corroborating evidence of why the decline occurred. Dr. Zeisz was not provided with the earlier scores. [T. 320].

17

For these reasons, the Court concludes that the ALJ's evaluation of Dr. Zeisz's opinion was proper, and that substantial evidence supports the ALJ's RFC finding.

**C. The ALJ properly assessed whether Plaintiff could perform his past relevant work and her findings are supported by substantial evidence.**

Finally, Plaintiff contends that the ALJ failed to determine the production and social demands of Plaintiff's past relevant work and compare such requirements to Plaintiff's RFC. As such, Plaintiff contends, the ALJ's determination that Plaintiff can perform his past work as a fast food cook/kitchen worker is not supported by substantial evidence.

This argument must be rejected. The record reflects that Plaintiff was questioned extensively regarding the demands of his past work. Plaintiff testified that he was working part-time at Zaxby's as a fast food cook and dishwasher at the time of the ALJ hearing, and he described the demands of that job in detail. The record further reflects that Plaintiff worked as a cook at Long John Silver's for approximately a year and a half and there is no indication that he had any difficulty performing that job. Indeed, Plaintiff testified that the reason he left that job was because the restaurant closed. [T. 70]. Notably, neither of these jobs required Plaintiff to have any interaction

18

with the general public. Further, while Plaintiff noted that he had difficulties with some past jobs because they were fast-paced, the record does not show that Plaintiff's work at Zaxby's or at Long John Silver's was so fast-paced that he could not perform the job as required.

In sum, there is substantial evidence to support the ALJ's finding that Plaintiff was not prevented by the functional limitations in his RFC from performing his past work as a fast food cook/kitchen worker as he had performed it or as generally performed in the national economy.

## VII. CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards, and that there is substantial evidence to support the ALJ's finding of no disability through the date of his decision.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 18] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 14] is **DENIED**.

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: November 29, 2011

Martin Reidinger
United States District Judge